CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

JUL 1 1 2007

JOHN F. CORCORAN, CLERK
BY: _____
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **MANCEY E. GILMORE,** | ) | |
| Plaintiff, | ) | Civil Action No. 2:06cv00060 |
| | ) | |
| **v.** | ) | **MEMORANDUM OPINION** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | By: GLEN M. WILLIAMS |
| **Commissioner of Social Security,**[1] | ) | SENIOR UNITED STATES DISTRICT |
| Defendant. | ) | JUDGE |

In this social security case, I will vacate the final decision of the Commissioner denying benefits and remand the case to the Commissioner for further consideration.

## I. Background and Standard of Review

The plaintiff, Mancey E. Gilmore, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying Gilmore's claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 and § 1381 *et seq.* (West 2003 & Supp. 2007). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3).

The court's review in this case is limited to determining if the factual findings

---

[1] Michael J. Astrue became the Commissioner of Social Security on February 12, 2007, and is, therefore, substituted for Jo Anne B. Barnhart as the defendant in this suit pursuant to Federal Rule of Civil Procedure 25(d)(1).

-1-

of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

On October 2, 2001, Gilmore filed applications for DIB and SSI, in which he alleged disability as of May 5, 1999. Thereafter, on January 9, 2002, the Social Security Administration determined that Gilmore was not disabled at any time from May 5, 1999, through the date of its decision. Gilmore did not pursue his administrative remedies; thus, the January 9, 2002, decision became the final determination of the Commissioner through that date.

The record shows that Gilmore protectively filed his current applications for DIB and SSI on or about November 27, 2002, alleging disability as of May 5, 1999,[2] due to back pain, neck pain, swelling and diabetes mellitus. (Record, ("R"), at 75-78, 82, 257-60.) The claims were denied initially and upon reconsideration. (R. at 55-63.) Gilmore then requested a hearing before an administrative law judge, ("ALJ").

---

[2] Although Gilmore's Leads/Protective Filing Worksheet indicated that the alleged onset date of disability was May 5, 1998, based upon a thorough review of the record, it appears that the actual alleged onset date was May 5, 1999.

(R. at 70.) The ALJ held a hearing on October 27, 2005, at which Gilmore was represented by counsel. (R. at 32-54.)

By opinion dated January 10, 2006, the ALJ denied Gilmore's claims. (R. at 17-24.) The ALJ determined that the doctrine of res judicata applied to the time period on or before January 9, 2002. (R. at 23.) He found that no new and material evidence had been presented, as all newly submitted evidence was dated subsequent to the prior decision and described Gilmore's condition after the prior decision. (R. at 18, 23.) As a result, the ALJ explained that there was no basis for reopening the prior administrative determination. (R. at 23.) Accordingly, the ALJ found that the January 2002 decision was final and binding as to the issue of disability on and prior to January 9, 2002. (R. at 23.) The ALJ also found that the claimant had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 23-24.) In addition, the ALJ determined that Gilmore met the non-disability requirements for a period of DIB set forth in Section 216(i) of the Social Security Act and was insured for benefits through September 30, 2003. (R. at 23.) The ALJ found that Gilmore's musculoskeletal and diabetes mellitus impairments were "severe" based on the requirements of 20 C.F.R. §§ 404.1520(c) and 416.920(c). (R. at 24.) However, he found that the impairments did not meet or medically equal one of the listed impairments at Appendix 1, Subpart P, Regulation No. 4. (R. at 24.) The ALJ also determined that Gilmore's allegations regarding his limitations were not totally credible. (R. at 24.) Furthermore, the ALJ found that Gilmore retained the residual functional capacity to perform light work[3] that involved frequent postural changes,

---

[3] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can do light work, he also can

Case 2:06-cv-00060-GMW-PMS   Document 15   Filed 07/11/07   Page 3 of 27   Pageid#: 69

with the ability to occasionally stoop, kneel and crouch. (R. at 24.) As a result, the ALJ determined that Gilmore was unable to perform his past relevant work. (R. at 24.) The ALJ concluded that Gilmore was not under a disability as defined under the Act and was not entitled to benefits. (R. at 17-24.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2006).

After the ALJ issued his decision, Gilmore pursued his administrative appeals and sought review of the ALJ's decision by the Appeals Council. (R. at 12.) However, on September 22, 2006, the Appeals Council denied Gilmore's request for review; thereby, making the ALJ's decision the final decision of the Commissioner. (R. at 5-8.) *See* 20 C.F.R. §§ 404.981, 416.1481 (2006). Thereafter, Gilmore filed this action seeking review of the ALJ's unfavorable decision. The case is currently before the court on Gilmore's motion for summary judgment, (Docket Item No. 11), which was filed on March 28, 2007, and the Commissioner's motion for summary judgment, (Docket Item No. 13), which was filed on April 30, 2007.

## II. Facts

At the time of the ALJ's decision, Gilmore was 51 years old, which classified him as a "person closely approaching advanced age" under 20 C.F.R. §§ 404.1563(d), 416.963(d). (R. at 19, 75, 78.) According to the record, Gilmore earned a general equivalency development diploma, ("GED"), and completed environmental job training, which classified him as having a "high school education and above" under 20 C.F.R. §§ 404.1564(b)(4), 416.964(b)(4). (R. at 19, 35, 50-51, 88.) Gilmore has

---

do sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2006).

past relevant work experience as a working foreman, as an assistant supervisor and as a machine operator. (R. at 83, 99-106.)

At the hearing before the ALJ on October 27, 2005, Gilmore testified that he he last worked as a machine operator in 2003. (R. at 36.) He indicated that it was a standing job that required him to lift a maximum of 50 pounds. (R. at 36.) Gilmore explained that he worked at that job for approximately one year. (R. at 36.) Gilmore also testified that he was employed as a working foreman by EnviroControl for eight to nine years, where he worked in asbestos and lead removal. (R. at 37-38.) Gilmore testified that he supervised as many as 40 employees. (R. at 38.) He stated that the job required him to lift objects such as radiators, tools and ladders. (R. at 38.) He also indicated that the job required him to stand and sit, and that he was on his feet 70 percent of the time. (R. at 38.) Gilmore stated that he was employed by EnviroTech for approximately 10-12 years as an assistant superintendent, where he essentially performed the same tasks that he performed while employed by EnviroControl. (R. at 38-39.)

Gilmore testified that he filed for disability due to injuries sustained in a 1999 automobile accident. (R. at 39-40.) He noted that he suffered neck and back injuries, and that he had experienced continuous back problems since the accident. (R. at 40.) Gilmore explained that surgery had not been performed on his neck or back, but that he had discussed the possibility of laser surgery to address his back problems. (R. at 41.) However, Gilmore testified that his doctor opined that the surgery may or may not help, so Gilmore elected to not proceed with surgery. (R. at 41.) Gilmore indicated that he suffered from low back pain, which he described as constant

-5-

"throbbing," especially when he bent. (R. at 41.) He testified that the pain was "always there." (R. at 41.) Gilmore was asked to describe his neck injuries, however, he indicated that, at the time of the hearing, his neck was not bothering him much. (R. at 42-43.) However, he stated that he was "stiff all over" and that his stiffness was constant. (R. at 43.)

In addition, Gilmore pointed out that he also experienced pain in both legs, which he attributed to his diabetes. (R. at 41.) Gilmore acknowledged that he was diagnosed with insulin dependent diabetes in 1996. (R. at 41.) He commented that his illness required him to take two insulin shots per day. (R. at 42.) At the time of the hearing, Gilmore had used insulin for approximately three years. (R. at 42.) Gilmore testified that his dosage had increased over this three year period. (R. at 42.) He further testified that his diabetes caused numbness and swelling in his feet. (R. at 43.) He noted that he had to wear sandals because his feet swell when wearing shoes. (R. at 43.) Gilmore attributed the swelling to circulation problems. (R. at 43.) Gilmore also stated that he suffered pain in his feet that felt "like a pin or something sticking." (R. at 43.) He testified that his problems with his feet had not caused walking difficulties. (R. at 44.) Gilmore acknowledged that he did not have a driver's license because he was "scared to drive because [he did not] know if [he could] control [the vehicle]." (R. at 44.) He remarked that the numbness in his feet made it difficult to drive. (R. at 44.)

Gilmore opined that he could stand for about 30 minutes, then he would have to sit or lay down. (R. at 44.) He also remarked that he could sit for about an hour and a half before having to stand. (R. at 44.) Gilmore stated that he usually would

-6-

lie down about two hours per day because of back and leg pain. (R. at 44.) He indicated that he never had been taken to the emergency room due to his diabetes. (R. at 45.) However, he explained that he had presented to the emergency due to headaches. (R. at 45.) Gilmore stated that the headaches could have been caused by his high blood pressure. (R. at 45-46.) Gilmore was asked whether or not his diabetes had caused problems to any other parts of his body. (R. at 46.) He testified that his eyesight was a problem; however, he later acknowledged that he had never been informed by a doctor that his eyesight problems were due to diabetes. (R. at 46.)

Gilmore testified that, during a typical day, he washed dishes and clothes, and assisted with grocery shopping. (R. at 47.) He also explained that he attended church regularly. (R. at 47.) He further explained that he had missed a bible study because of his leg pain, and that the pain caused him to be irritable when around others. (R. at 47-48.) Gilmore indicated that he had no hobbies, other than singing in the church choir. (R. at 48.)

Gilmore stated that he often woke up in pain and had difficulty sleeping; thus, he was prescribed Ambien to help him sleep through the night. (R. at 49.) Gilmore testified that he also was prescribed Flexeril, a muscle relaxer, to address his lower back problems. (R. at 49.) Furthermore, Gilmore commented that his blood sugar level stays between 200-250. (R. at 50.) He stated that he watched his diet, but was unable to lower his blood sugar level to a normal level. (R. at 50.)

Robert Spangler, a vocational expert, also testified at Gilmore's hearing. (R. at 51-53.) Spangler identified Gilmore's employment as a working foreman as

-7-

skilled, medium[4] to heavy work,[5] with no light or sedentary skills. (R. at 51) Similarly, Spangler opined that Gilmore's employment as an assistant superintendent was skilled, medium to heavy work, with no light or sedentary skills. (R. at 51-52.) Spangler then identified Gilmore's employment as a machine operator as "medium to semiskilled," with no transferable skills. (R. at 52.)

Spangler was asked to assume a hypothetical claimant of the same age and educational background as Gilmore, with the ability to perform light work that allows frequent postural changes and the ability to occasionally stoop, kneel or crouch. (R. at 52.) Based upon the previously mentioned restrictions, Spangler was asked if there were any jobs within the regional or national economy that an individual with those limitations could perform. (R. at 52.) Spangler opined that there were many jobs within the regional and national economy which this hypothetical individual could perform, such as a cashier, an interviewer, an information clerk, a factory messenger, a general office clerk and a production machine tender. (R. at 52.)

Spangler then was asked to assume that the hypothetical individual's pain frequently interfered with his ability to concentrate and persist at work. (R. at 53.) Based upon this limitation, Spangler was again asked if the hypothetical individual was capable of performing any of the previously mentioned jobs, to which Spangler

---

[4] Medium work involves lifting items weighing up to 50 pounds with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, he also can perform light work or sedentary work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2006).

[5] Heavy work involves lifting items weighing up to 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If someone can perform heavy work, he also can perform medium, light and sedentary work. *See* C.F.R. §§ 404.1567(d), 416.967(d) (2006).

-8-

responded negatively. (R. at 53.) Spangler stated that his testimony was consistent with the Dictionary of Occupational Titles. (R. at 53.)

At the conclusion of Spangler's testimony, counsel for Gilmore noted that the record contained a medical report which indicated that Gilmore was unable to stand, walk or sit for a total of eight hours per day. (R. at 53.) Gilmore's counsel also pointed out that the record supported the claimant's testimony as to the pain and numbness to his feet. (R. at 53.)

In rendering his decision, the ALJ reviewed records from Appalachian Regional Healthcare, ("Appalachian Regional"); Dr. Ira Potter, M.D.; Dr. Joseph Williams Jr., M.D.; Dr. Abhijit Shukla, M.D.; Mountain View Regional Medical Center, ("Mountain View"); Dr. Richard M. Surrusco, M.D., a state agency physician; and Dr. Frank M. Johnson, M.D., a state agency physician.

On May 5, 1999, Gilmore presented to the Appalachian Regional emergency room due to injuries sustained in an automobile accident. (R. at 131-35.) The medical records from this visit indicated that Gilmore's chief complaint was lower back pain.[6] (R. at 131.) Gilmore was prescribed Toradol, Robaxin and Lorcet. (R. at 132.) An x-ray of the L5 spine and cervical spine was ordered. (R. at 132.) The x-rays of the lumbar spine indicated that the lumbar vertebral heights and disc spaces were normal. (R. at 134.) A marginal anterior spur formation was noted off of the inferior endplate of L5. (R. at 134.) Furthermore, the bony alignment and lumbar

---

[6] The medical records from the May 5, 1999, emergency room visit are largely illegible. (R. at 131-32.)

lordotic curvature were well-maintained, while the pedicles, apophyseal joints and posterior elements were intact. (R. at 134.) The x-ray revealed no evidence of acute fracture, dislocation or other osseous abnormality. (R. at 134.)

The x-ray of the cervical spine showed the cervical vertebral heights and disc spaces to be normal and also indicated a normal bony alignment. (R. at 135.) A straightened cervical lordotic curvature was noted, which was attributed to the patient's positioning. (R. at 135.) The spinal canal was reported to be of normal dimension throughout the cervical spine and contour lines also were normal. (R. at 135.) The pedicles, apophyseal joints and posterior elements were intact. (R. at 135.) No evidence of an acute fracture, dislocation or other osseous abnormality was discovered. (R. at 135.) Following an examination and x-rays, Gilmore was released from the emergency room and medical records indicated that he was in good condition upon release. (R. at 132.)

Gilmore sought treatment from Dr. Ira Potter, M.D., from May 11, 1999, to September 10, 2004. (R. at 136-99.) On May 11, 1999, Gilmore presented to Dr. Potter regarding symptoms that had arisen after his automobile accident. (R. at 180-81.) Gilmore complained of headaches, occasional dizziness, neck pain, back pain, swollen hands, numbness at the end of his fingers and a tingling feeling in both hands. (R. at 180.) He also reported difficultly with bending, stooping and prolonged standing, as well as the inability to sleep, do chores and perform his job. (R. at 180.) Dr. Potter noted that Gilmore was unable to return to work after the accident. (R. at 180.) Upon examination, Dr. Potter noted tenderness over the cervical spine posteriorly and bilaterally, as well as tenderness over the lumbar spine

-10-

with a paraspinous muscle spasm noted. (R. at 181.) Dr. Potter's assessment reported acute lumbar spine pain and acute cervical spine pain. (R. at 181.) Dr. Potter determined that Gilmore should continue with the same medications originally prescribed to him following the accident, and also ordered a computerized axial tomography, ("CT scan"), of the lumbar spine. (R. at 181.) Dr. Potter instructed Gilmore to begin ice and soft pulse treatment and requested that Gilmore return in one week. (R. at 181.) The CT scan was performed on May 12, 1999, and no osseous or facet joint abnormality was noted. (R. at 188.) No spinal stenosis or discrete disc protrusion of the disc spaces was visualized. (R. at 188.) Gilmore's lumbosacral spine was found to be within normal limits. (R. at 188.)

On May 18, 1999, Gilmore presented to Dr. Potter for a follow-up appointment and continued to complain of low back pain and neck pain. (R. at 179.) He also reported that he had experienced difficulty sleeping and that he continued to wear a neck collar for support. (R. at 179.) Dr. Potter's assessment noted acute cervical and lumbar spine pain. (R. at 179.) Dr. Potter prescribed Ambien to treat Gilmore's sleeping problems, and advised Gilmore to continue with his other medications. (R. at 179.) Dr. Potter also suggested that Gilmore continue ice and soft pulse treatment and custom orthosis. (R. at 179.) In addition, he recommended magnetic resonance imaging, ("MRI"), of the lumbar spine and instructed Gilmore to return in three weeks. (R. at 179.) The MRI indicated moderately severe degenerative disc disease at L5-S1 without a focal disc herniation or canal stenosis. (R. at 186-87.)

Gilmore returned for another follow-up examination on June 9, 1999. (R. at 177.) Dr. Potter reported that Gilmore's neck pain had improved with treatments. (R.

-11-

at 177.) Once again, Dr. Potter noted tenderness over the lumbar area. (R. at 177.) Motor examinations revealed leg weakness and numbness. (R. at 177.) Dr. Potter found Gilmore to be experiencing acute cervical and lumbar spine pain with leg symptoms. (R. at 177.) Gilmore was advised to continue his current treatments to the lumbar spine area, and prescribed Ambien, Lorcet and Naprosyn. (R. at 177.) In addition, Gilmore was referred to Dr. Joseph Williams Jr., M.D., of the Spine & Brain Neurosurgical Center.[7] (R. at 177.) Dr. Potter suggested a nerve conduction study of the lumbar spine and scheduled another follow-up appointment. (R. at 177.)

On June 30, 1999, Gilmore saw Dr. Potter regarding his lower back pain and complaints of neck pain and left wrist pain. (R. at 176.) Dr. Potter's assessment and treatment recommendations were unchanged. (R. at 176.) Gilmore again was instructed to see Dr. Williams. (R. at 176.) On July 13, 1999, a nerve conduction study of the lower extremity revealed findings that were indicative of abnormal motor and sensory neuropathic changes, consistent with a bilateral peripheral neuropathy. (R. at 183.) A somatosensory evoked potential study and a dermatomal evoked potential study of the lower extremity indicated normal responses. (R. at 184-85.)

On July 21, 1999, Gilmore presented to Dr. Potter with the same complaints and symptoms. (R. at 174.) In addition to his previous problems, Dr. Potter noted right leg weakness and again reported that Gilmore was experiencing acute cervical spine pain and lumbar spine pain with radiculopathy. (R. at 174.) Gilmore told Dr. Potter that he was unable to perform the exercises that Dr. Williams had recommended. (R. at 174.)

---

[7] Dr. Williams's treatment of the plaintiff is discussed in detail later in this section.

-12-

Gilmore presented to Dr. Potter on August 8, 1999, November 18, 1999, December 16, 1999, and February 10, 2000. (R. at 168-73.) The medical records from this visit demonstrated that Gilmore's condition, allegations of pain and treatment remained the same throughout this time period. (R. at 168-73.) On December 16, 1999, Gilmore explained that his injuries made activities such as sports, child care and household chores very difficult. (R. at 170.) Dr. Potter opined that Gilmore could sit for one half hour at a time, or for approximately two hours in an eight-hour workday. (R. at 170.) Dr. Potter also noted that Gilmore was capable of standing or walking for about one hour, or for about two hours in an eight-hour workday. (R. at 170.) He explained that walking tended to exacerbate Gilmore's pain. (R. at 170.)

At Gilmore's appointment on May 24, 2000, he saw Dr. Potter and complained of lower back pain and indicated that he could not lift, bend or stoop. (R. at 166.) Dr. Potter reported that Gilmore's neck condition had improved and explained that Gilmore's chronic cervical spine pain also had improved. (R. at 166.) No other changes were noted, and his treatment remained the same. (R. at 166.) On December 6, 2000, Gilmore presented and communicated the same symptoms, but added that he was unable to sit or walk for long periods. (R. at 163.) Gilmore also saw Dr. Potter on March 28, 2001, July 31, 2001, December 4, 2001, and April 4, 2002. (R. at 157-62.) In each of the visits, Gilmore's complaints remained the same, as did his assessment and treatment. (R. at 157-62.)

Gilmore returned on April 14, 2002, and complained of the same symptoms. (R. at 156.) Tenderness was once again noted in the lumbar spine area and a CT scan

-13-

was proposed. (R. at 156.) On August 5, 2002, Gilmore presented for a follow-up appointment and indicated numbness in his feet, lower back pain, neck pain and right leg pain. (R. at 155.) Gilmore was prescribed Lorcet, Naprosyn and Flexeril. (R. at 155.) After Gilmore's August 2002 appointment, he continued to seek treatment from Dr. Potter on a regular basis from December 12, 2002, until September 10, 2004. (R. at 136-54.) During this time period, Gilmore's complaints, symptoms, assessment and treatment remained unchanged. (R. at 136-54.)

The record also contains an undated Physical Assessment of Ability to Do Work-Related Activities form completed by Dr. Potter. (R. at 198-99.) Dr. Potter reported that Gilmore's ability to lift/carry was affected by his impairments. (R. at 198.) Dr. Potter opined that Gilmore was capable of lifting items weighing up to 25 pounds occasionally, and items weighing up to 15 pounds frequently. (R. at 198.) In support of these findings, Dr. Potter noted that Gilmore suffered from degenerative disc disease with a history of chronic lower back pain, as well as insulin dependent diabetes mellitus. (R. at 198.) Dr. Potter determined that Gilmore's impairments affected his ability to stand and/or walk. (R. at 198.) Dr. Potter found that Gilmore could stand and/or walk for a total of two hours in an eight-hour workday, with the ability to stand and/or walk without interruption for one hour. (R. at 198.) In addition, Dr. Potter indicated that Gilmore was able to sit for a total of three hours in an 8-hour workday, and that he could only sit for one hour without interruption. (R. at 198.) Dr. Potter opined that Gilmore could occasionally kneel, crouch and stoop, frequently balance, but never climb or crawl. (R. at 199.) Gilmore was reported to be unaffected in his ability to reach, handle, feel, see, hear and speak. (R. at 199.) However, Gilmore was found to be limited in his ability to push/pull because of his

-14-

history of back pain. (R. at 199.) No environment restrictions were noted. (R. at 199.)

As mentioned earlier, Dr. Potter referred Gilmore to Dr. Williams of the Spine & Brain Neurosurgical Center. On July 13, 1999, Dr. Williams, after reviewing Gilmore's medical records and performing a physical examination, diagnosed Gilmore with a cervical and lumbar strain, a left wrist injury and cervicalgia. (R. at 202.) Dr. Williams noted that a June 1999 CT scan was normal, with the exception of some mild degenerative changes. (R. at 202.) Dr. Williams prescribed Soma and suggested stretching exercises. (R. at 202.) Gilmore saw Dr. Williams again on August 10, 1999. (R. at 200.) Dr. Williams reported no changes in his findings. (R. at 200.) However, upon a review of an MRI, Dr. Williams mentioned a small herniation at L5-SI on the right. (R. at 200.) He indicated that the herniation was "quite small," but remarked that he feared that a fragment had moved and caused a pull against the nerve root at S1. (R. at 200.) Dr. Williams explained that because of the small size of the herniation, he had "good hope that [Gilmore would] start to heal." (R. at 200.) Dr. Williams started Gilmore on Glycocyamine and instructed him to continue his other medications. (R. at 200.) Gilmore also was prescribed Lorcet. (R. at 200.)

Gilmore was treated by Dr. Abhijit Shukla, M.D., from July 25, 2001, until December 21, 2001. (R. at 203-26.) On July 25, 2001, Gilmore indicated that he had experienced problems with his diabetic medications, specifically Diabeta. (R. at 211.) He informed Dr. Shukla that he had been diagnosed with diabetes two years prior to the visit, but that he had not followed up properly. (R. at 211.) Gilmore complained

-15-

of "low spells" when taking Diabeta. (R. at 211.) The medical records demonstrated that Gilmore denied any back pain at this particular office visit, and, upon examination, no spinal tenderness was noted. (R. at 211.) In addition, Gilmore was reported to have a full range of motion without limitation in all joints. (R. at 211.) Dr. Shukla altered Gilmore's medication and replaced the Diabeta with Glucophage. (R. at 212.) Dr. Shukla ordered blood tests, instructed Gilmore to monitor his sugars, encouraged him to exercise and recommended that he follow a diabetic diet. (R. at 212.)

As a follow-up, Gilmore again sought treatment from Dr. Shukla on August 9, 2001. (R. at 210.) Dr. Shukla decided to prescribe Actos to Gilmore and discontinue Glucophage. (R. at 210.) Dr. Shukla reported that Gilmore's blood sugars were not under control, and he also noted high cholesterol. (R. at 210.) Gilmore once again was urged to exercise and follow a diabetic diet. (R. at 210.) On September 10, 2001, Gilmore presented to Dr. Shukla and stated that he had been checking his blood sugar levels two times per week. (R. at 208.) Dr. Shukla noted that Gilmore had tolerated the Actos well, but explained that Gilmore's blood sugar level was not under control. (R. at 208.) Dr. Shukla again reported that Gilmore's cholesterol level was high. (R. at 208.) Gilmore was instructed to continue Actos and also was prescribed Lantus. (R. at 208.) Shortly thereafter, on September 18, 2001, Dr. Shukla noted that Gilmore's blood sugar level was still not under control. (R. at 207.) Thus, he increased Gilmore's dosages of Actos and Lantos. (R. at 207.) Dr. Shukla once again suggested that Gilmore should follow a diabetic diet, monitor his blood sugar and exercise regularly. (R. at 207.)

On September 25, 2001, and October 9, 2001, Gilmore visited Dr. Shukla for follow-up appointments. (R. at 205-06.) Dr. Shukla's report remained the same; however, Gilmore's dosage of Lantos was increased and the medications Humalog, Zocor, Pletal and Zestril were added. (R. at 205-06.) On December 10, 2001, Gilmore's medical records indicated that his diabetes remained uncontrolled. (R. at 204-05.) Gilmore also complained of numbness and tingling in his legs. (R. at 204-05.) In addition to noting Gilmore's high cholesterol and diabetes mellitus, Dr. Shukla's assessment noted peripheral neuropathy and peripheral vascular disease. (R. at 204.) Dr. Shukla decided to discontinue the dosage of Lantus, instructed Gilmore to continue with his other medications and prescribed Neurontin. (R. at 204.) On December 21, 2001, Dr. Shukla noted Gilmore's continued problems with diabetes mellitus, high cholesterol and peripheral neuropathy. (R. at 203.) Dr. Shukla also reported hypertension, and decreased Gilmore's dosage of Humalog. (R. at 203.)

On May 19, 2003, Dr. Richard M. Surrusco, M.D., a state agency physician, performed a Physical Residual Functional Capacity Assessment, ("PRFC"). (R. at 227-34.) Dr. Surrusco determined that Gilmore was capable of lifting and/or carrying items weighing up to 50 pounds occasionally, and that he possessed the ability to frequently lift and/or carry items weighing up to 25 pounds. (R. at 228.) Dr. Surrusco also found that Gilmore could stand and/or walk for a total of about six hours in an eight-hour workday, and that he could sit for a total of about six hours in an eight-hour workday. (R. at 228.) Gilmore was found to be unlimited in his ability to push and/or pull. (R. at 228.) Additionally, Dr. Surrusco opined that Gilmore could occasionally climb, balance, stoop, kneel, crouch and crawl. (R. at 229.) No

environmental, communicative, visual or manipulative limitations were noted. (R. at 230-31.)

On December 13, 2004, Dr. Frank M. Johnson, a state agency physician, conducted a Psychiatric Review Technique Form, ("PTFC"). (R. at 236-41.) Dr. Johnson indicated that Gilmore was capable of occasionally lifting and/or carrying items weighing up to 50 pounds, and that he could frequently lift and/or carry items weighing up to 25 pounds. (R. at 237.) He also determined that Gilmore retained the ability to stand and/or walk for approximately six hours in an eight-hour workday and sit for a total of about six hours in an eight-hour workday. (R. at 237.) Dr. Johnson found that Gilmore was unlimited in his ability to push and/or pull. (R. at 237.) In addition, Dr. Johnson opined that Gilmore could frequently balance, but could only occasionally climb, stoop, kneel, crouch and crawl. (R. at 238.) No environmental, communicative, visual or manipulative limitations were reported. (R. at 238-39.) Dr. Johnson determined that Gilmore's statements as to his limitations were partially credible. (R. at 241.)

Gilmore presented to the Mountain View emergency room on September 6, 2005, and complained of pain to the top of his head. (R. at 242.) He rated his pain as a ten on a one-to-ten scale, and explained that the pain was constant and sharp. (R. at 242.) Medical records indicated that Gilmore was able to ambulate independently and perform all activities of daily living without assistance. (R. at 242.) Gilmore was discharged after an evaluation, but his pain and condition was reported to be unchanged at the time of discharge. (R. at 242.) It appears from the medical records that a CT scan was ordered; however, there is no documentation of any CT scan

results from that time period.  (R. at 244.)

*III.  Analysis*

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2006); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981).  This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* C.F.R. §§ 404.1520, 416.920 (2006). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2006).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments.  Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner.  To satisfy the burden, the Commissioner must then establish that the claimant maintains the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2007); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

-19-

By opinion dated January 10, 2006, the ALJ denied Gilmore's claims. (R. at 17-24.) The ALJ determined that the doctrine of res judicata applied to the time period on or before January 9, 2002. (R. at 23.) He found that no new and material evidence had been presented, as all newly submitted evidence was dated subsequent to the prior decision and described Gilmore's condition after the prior decision. (R. at 18, 23.) As a result, the ALJ explained that there was no basis for reopening the prior administrative determination. (R. at 23.) Accordingly, the ALJ found that the January 2002 decision was final and binding as to the issue of disability on and prior to January 9, 2002. (R. at 23.) The ALJ also found that the claimant had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 23-24.) In addition, the ALJ determined that Gilmore met the non-disability requirements for a period of DIB set forth in Section 216(i) of the Social Security Act and was insured for benefits through September 30, 2003. (R. at 23.) The ALJ found that Gilmore's musculoskeletal and diabetes mellitus impairments were "severe" based on the requirements of 20 C.F.R. §§ 404.1520(c) and 416.920(c). (R. at 24.) However, he found that the impairments did not meet or medically equal one of the listed impairments at Appendix 1, Subpart P, Regulation No. 4. (R. at 24.) The ALJ also determined that Gilmore's allegations regarding his limitations were not totally credible. (R. at 24.) Furthermore, the ALJ found that Gilmore retained the residual functional capacity to perform light work that involved frequent postural changes, with the ability to occasionally stoop, kneel and crouch. (R. at 24.) As a result, the ALJ determined that Gilmore was unable to perform his past relevant work. (R. at 24.) The ALJ concluded that Gilmore was not under a disability as defined under the Act and was not entitled to benefits. (R. at 17-24.) *See* 20 C.F.R. § 404.1520(g), 416.920(g) (2006).

-20-

Gilmore argues that the ALJ erred in dismissing his claim with regards to the time period on or before January 9, 2002. (Plaintiff's Brief in Support of Motion for Summary Judgment, ("Plaintiff's Brief"), at 8-10.) Gilmore also argues that the ALJ failed to apply the proper weight to the opinions of Gilmore's treating physician. (Plaintiff's Brief 10-13.) Lastly, Gilmore argues the ALJ's residual functional capacity finding was not supported by substantial evidence. (Plaintiff's Brief 13-18.)

The court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks the authority to substitute its judgment for that of the Commissioner, provided that his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

It is well-settled that the ALJ has a duty to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Specifically, the ALJ must indicate explicitly that he has weighed all relevant evidence and must indicate the weight given to this evidence. *See Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979). While an ALJ may not reject medical evidence for no reason or for the wrong reason, see *King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical

opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

Gilmore's first argument is that the ALJ erred in dismissing his claim as it related to the time period on or before January 9, 2002. (Plaintiff's Brief at 8-10.) Specifically, Gilmore argues that the ALJ failed to consider the fact that a claim may be reopened within 12 months of the date of the notice of the initial determination for any reason. *See* 20 C.F.R. §§ 404.988(a), 416.1488(a). Gilmore also contends that the ALJ erred in applying the doctrine of res judicata to the time period on of before January 9, 2002. (Plaintiff's Brief at 8-10.)

In general, when a claimant does not request further review and pursue his administrative remedies, a decision becomes final. *See* 20 C.F.R. §§ 404.987(a), 416.1487(a) (2006). In the ALJ's decision, he acknowledged that the Commissioner's regulations provide that a decision or determination which has become final and binding may be reopened. (R. at 18.) The regulations state that the Social Security Administration "may reopen a final determination or decision on [it's] own initiative, or [the claimant] may ask that a final determination or a decision to which [he was] a party be reopened." 20 C.F.R. §§ 404.987(b), 416.1487(b) (2006). Furthermore, in relevant part, the Commissioner's regulations also provide that a determination or decision may be reopened "(a) [w]ithin 12 months of the date of the notice of the initial determination, for any reason; [or] (b) [w]ithin four years [or two years for SSI] of the date of the notice of the initial determination if . . . good cause [is found] to reopen the case . . . ." 20 C.F.R. §§ 404.988, 416.1488 (2006).

-22-

In this case, the record is devoid of any information indicating that Gilmore asked that the final determination of the Commissioner be reopened. Gilmore did file a new claim by virtue of his current DIB and SSI applications on November 27, 2002, which was clearly within the applicable time-frame. However, the filing of a new claim inherently suggests that the initial claim has been abandoned and that a new claim is being pursued. Despite the fact that Gilmore filed his current applications approximately 10 months after the January 2002 determination, there is no documentation within the record memorializing any request to reopen his original claim.

Here, the reopening process was not mentioned until the ALJ discussed it within his opinion. However, the ALJ did not specifically discuss each way that a determination or decision may be reopened. As argued by Gilmore, in the ALJ's opinion, he failed to recognize the fact that the Commissioner could reopen a case within 12 months "for any reason." 20 C.F.R. §§ 404.988, 416.1488 (2006). The ALJ focused on the fact that a case could be reopened within the requisite time constraints if good cause existed. (R. at 18.) Pursuant to the Commissioner's regulations, good cause to reopen a determination or decision is present where "(1) [n]ew and material evidence is furnished; (2) [a] clerical error in the computation or recomputation of benefits was made; or (3) [t]he evidence that was considered in making the determination or decision clearly shows on its face that an error was made." 20 C.F.R. §§ 404. 989, 416.1489 (2006). In addition, the ALJ pointed out that res judicata applies when the Commissioner has "made a previous determination or decision . . . about [the claimant's] rights on the same facts and on the same issue or issues, and this previous determination or decision has become final by either

-23-

administrative or judicial action."   20 C.F.R. §§ 404.957(c)(1), 416.1457(c)(1) (2006).

In analyzing the facts, the ALJ determined that Gilmore's current claim involved the same facts and issues which were previously decided in the January 9, 2002, determination.  (R. at 18.)  He acknowledged that Gilmore had submitted additional evidence that was not considered in the January 2002 determination; however, he explained that the additional evidence was dated subsequent to the prior determination and that the evidence described Gilmore's condition since the decision. (R. at 18.)  The ALJ concluded that the additional evidence was not new and material, and that the case should not be reopened.  (R. at 18.)  The ALJ found that the doctrine of res judicata applied to the issue of disability from May 5, 1999, through January 9, 2002.  (R. at 18.)

In determining whether the ALJ's decisions as to the previously mentioned issues are supported by substantial evidence, it is necessary to examine what evidence was considered by the Commissioner in denying Gilmore's initial applications for DIB and SSI.  While the ALJ opined that the additional evidence provided by Gilmore was dated subsequent to the initial decision, and was in reference to his condition since that time, this court is of the opinion that the record is unclear as to precisely what evidence was originally before the Commissioner.  In an explanation of the January 2002 determination, the Commissioner noted that the following evidence was considered with regards to Gilmore's claim: "Potter Medical Center report received 12/27/01; Dr. Shukla report received 12/18/02; [and] Dr. Awan report received 1/3/01."  (R. at 255.)  There is no information that indicated what type of

-24-

medical records or evidence was considered, or when the treatment or office visits occurred. Moreover, a further explanation of the denial seemed to focus exclusively upon Gilmore's difficulties with diabetes, blurred vision and his problems with standing due to leg weakness. (R. at 255.) It should be noted that Gilmore's initial claim was not simply based upon diabetes, blurred vision and problems standing; instead, the records demonstrated that while Gilmore's primary diagnosis was listed as diabetes, his secondary diagnosis plainly referred to disorders of the back. (R. at 253.)

Notably absent from the January 2002 explanation of determination was any mention of Gilmore's back pain and neck pain, which, as the medical records indicated, he had been treated for since his May 5, 1999, automobile accident. There are approximately 30 pages of medical records from Dr. Potter that are dated prior to December 27, 2001, i.e. the date the records from Potter Medical Center were received by the Commissioner in Gilmore's initial claim. Nearly every page refers to Gilmore's complaints and symptoms of back pain, neck pain and diabetes, as well as Dr. Potter's assessments and treatment plans. Thus, this court is of the opinion that there would have been a significant mention of Gilmore's back and neck problems in the January 2002 explanation of determination if those particular medical records had been considered.

Since there was no specific reference to Gilmore's back and neck problems, one could logically assume that those medical records were not submitted until after the initial determination. If so, there is a very sound argument that the evidence could be viewed as new and material, or that res judicata did not apply because the decision

was not made based upon the same facts and/or issues. However, based upon the record as presented, it is unclear which records from Dr. Potter were actually considered. Moreover, although the explanation of determination stated that records from Dr. Awan were considered, a thorough review of the record appears to reveal no medical records or evidence from a Dr. Awan. This fact provides further evidence that the information considered initially may have been substantially different than what the ALJ considered; thus, despite the fact that the ALJ found that no new and material evidence was presented that justified reopening the case as to the period on or before January 9, 2002, there is an obvious ambiguity as to what evidence was initially before the Commissioner.

Therefore, whether this court is reviewing the ALJ's decision as to whether new and material evidence was presented by Gilmore to support his argument to reopen this case, or whether the court is reviewing the ALJ's decision regarding res judicata, I am of the opinion that there is great uncertainty as to what was originally considered. Based upon the January 2002 explanation of determination, it is impossible to determine what type of medical records and reports were initially evaluated. As discussed earlier, res judicata applies when the Commissioner has made a prior determination as to the claimant's rights based upon the same facts and issues and that prior determination has become final. *See* 20 C.F.R. §§ 404.975(c)(1), 416.1457(c)(1). In the case at hand, because Gilmore did not pursue his administrative remedies as to the January 2002 determination, the determination became final. In order to determine if the Commissioner's previous decision was made based upon the same facts and issues, we must be certain as to what medical evidence was considered. However, in this case, the explanation as to what was

-26-

considered is vague and ambiguous.

Thus, this court is of the opinion that the ALJ's findings as to the issues of res judicata and whether the claimant produced new and material evidence that constituted good cause to reopen the case are not supported by substantial evidence. As a result, this court sees no reason to address the remaining issues presented by Gilmore as the case will be remanded for further consideration. Accordingly, this case shall be remanded for further development of the record.

## IV. Conclusion

For the foregoing reasons, I will deny the Commissioner's motion for summary judgment. The Commissioner's decision denying benefits will be vacated, and the case will be remanded to the ALJ for further development of the record.

An appropriate order will be entered.

DATED: This ___11th___ day of July, 2007.

_____
THE HONORABLE GLEN M. WILLIAMS
SENIOR UNITED STATES DISTRICT JUDGE

Case 2:06-cv-00060-GMW-PMS   Document 15   Filed 07/11/07   Page 27 of 27   Pageid#: 93